**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 16-CR-0027-CVE** |
| | ) | |
| **RODNEY MARK AGUIRRE,** | ) | |
| **a/k/a "King Joker,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court is defendant's Motion to Suppress and Brief in Support (Dkt. # 20).[1]

Defendant was charged by a grand jury with possession of a firearm and ammunition after former

felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Dkt. # 15. Defendant argues

that officers conducted an illegal search of a residence in which defendant, the firearms, and the

ammunition were located and asserts that all evidence seized from the residence should be

suppressed. Id. at 1-2. Defendant asserts that agents conducted a warrantless search of the

residence, that no party at the residence gave consent to search, that agents had no probable cause

to conduct a search, and that no exigent circumstances existed. Id. at 2. Defendant argues that, as

social guest at the residence, he has standing to seek the suppression of evidence recovered from the

allegedly illegal search. Id. at 5. The government does not challenge that defendant has standing

to assert a Fourth Amendment claim, but argues that the search was permissible because the initial

search of the residence was conducted as a protective sweep, probable cause and exigent

---

[1]     Although defendant has also filed a motion in limine (Dkt. # 21), this opinion and order
addresses only defendant's motion to suppress.

circumstances justified the sweep, and, even if the protective sweep were unlawful, the evidence is admissible under the doctrine of inevitable discovery. Dkt. # 22, at 6. The Court held a suppression hearing on April 11, 2016, at which the government offered the testimony of Drug Enforcement Administration (DEA) Task Force Officer (TFO) Timothy Turner, Oklahoma Bureau of Narcotics (OBN) Senior Agent Matt Varney, OBN Agent Spencer Gilmore, OBN Agent Jason Tucker, OBN Narcotics Agent John Morrison, and DEA Special Agent Brian Epps. Defendant offered the testimony of Cherokee Wilson. Both parties offered exhibits.

### I. Evidentiary Burden

"Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998). The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has the 'the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the search.'" Gama-Bastidas, 142 F.3d at 1238 (quoting United States v. Skowronski, 827 F.2d 1414, 1417 (10th Cir. 1987)). Defendant's burden to show a violation of his constitutional rights is distinct from the government's burden regarding admissibility of evidence it seeks to introduce: "[U]pon a motion to suppress, the 'burden of showing admissibility rests, of course, on the prosecution.'" United States v. Mikolon, 719 F.3d 1184, 1189 (10th Cir. 2013) (quoting Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004)).

2

## II. Witness Testimony

### A. TFO Turner

The Court first heard the testimony of TFO Timothy Turner, a task force officer currently assigned to the DEA's McAlester office, concerning his involvement in the drug investigation that resulted in the search of a residence and defendant's arrest.  Turner testified that agents received information about a planned drug transaction through a Title III wiretap of a cell phone being used by Cody McClendon, an inmate in the Oklahoma State Penitentiary.  Turner testified that, through this intercept, agents received information that an individual or individuals were coming to Tulsa, Oklahoma for the purposes of picking up approximately two pounds of methamphetamine.  Turner explained that agents monitored communications throughout the day among McClendon, the two individuals traveling to Tulsa, Donald Trammel and Nathan Green, and an unidentified Hispanic male.  Turner testified that Trammel and Green traveled to Tulsa in two separate vehicles, but traveled in tandem.  Turner testified that the vehicle driven by Green was a white Ford pickup truck. Turner testified that, while both men were in route,  officers intercepted a communication in which the Hispanic male provided an address for the transaction: 731 North Atlanta Avenue, Tulsa, Oklahoma.  Turner testified that agents also learned that both Green and Trammel had gotten lost in Tulsa, and intercepted a communication in which the Hispanic male directed both men to meet another individual at a grocery store, Las Americas Mercado, near the Atlanta Avenue residence.

Turner testified that he then received information that surveillance had observed Green arriving at the grocery store and meeting another vehicle in the parking lot.  Turner described this other vehicle as a white Lincoln Towncar with a tan or brown top and explained that agents were familiar with the vehicle through its presence at previous drug transactions agents had surveilled.

3

Turner stated that surveillance observed the white car with the brown top leave the parking lot, followed by the white Ford pickup truck driven by Green.  Turner stated that he was unaware of Trammel's whereabouts at this point.  Turner testified that surveillance then observed the vehicles arrive at 731 North Atlanta Avenue.  Turner explained that the wiretap of McClendon's cell phone revealed communications between McClendon and the unidentified Hispanic male after the vehicles arrived at the residence.  Turner testified that the unidentified Hispanic male sent a text message to McClendon stating "We're counting pesos," to which McClendon replied "Excellent."  Turner stated that a short time later, the white Ford pickup truck departed the residence.  Turner testified that, at this point, he was not at the residence,  but was about a block and half away.  He explained that the Tulsa Police Department(TPD) Special Investigations Unit was conducting surveillance of the residence.

Turner testified that, shortly after Green left the residence in the white Ford pickup truck, agents intercepted a communication between Green and McClendon in which Green stated that he had left the residence and had possession of the methamphetamine.  Turner testified that shortly thereafter, at around 7:30 p.m. or 8:00 p.m., TPD officers conducted a traffic stop of Green's white Ford pickup truck.  Turner stated officers recovered approximately two pounds of methamphetamine from Green's vehicle during the traffic stop.  Turner testified that, during the stop, Green did not make any statements to law enforcement about the methamphetamine recovered.  Turner testified that, after the traffic stop was conducted, he and another agent drove by the residence at 731 North Atlanta Avenue and noticed the white car with a brown top parked at the residence.

Turner stated that he and other agents then went to the residence at 731 North Atlanta Avenue, intending to seek consent to search the residence or to apply for a state search warrant if

4

they could not obtain consent.[2]  Turner stated that they arrived at the residence approximately fifteen minutes after the traffic stop.  Turner testified that, as he approached the residence in his vehicle, he observed that the front door to the residence was open.  Turner stated that he observed this open door because it was dark outside and light was emanating from inside the house.  Turner testified that, after arriving, he and other agents approached the front porch of the residence, at which point he heard what he believed to be a door shut and more than one person running.  He stated that he could not tell whether the running was coming from inside or outside of the house.  He stated that, at that point, he was ten to fifteen feet away from the front porch.  Turner testified that he shouted "There's a runner, There's a runner," to alert the other agents.

Turner testified that the agents continued their approach to the front porch, and that Turner was the first officer to reach the front door.  He stated that, through the open front door, he observed two shotguns laying on a table directly to the left of the front door.  Turner testified that he could see the shotguns from the open front door without entering the residence. Turner testified that, after he saw the shotguns, he and other agents started announcing themselves as police and requested that any individuals in the home exit so agents could secure the residence.  Turner testified that he wanted to secure the residence because of potential destruction of evidence and for officer safety. Turner testified that he was concerned about the destruction of evidence because he believed that the drug transaction involving the two pounds of methamphetamine occurred at the residence, that the sounds of people running indicated that a person could be destroying evidence, and that the amount of methamphetamine he believed to have come from the residence raised the possibility that

---

[2]       Although TFO Turner did not testify as to the approximate time agents arrived at the residence, the DEA investigation report, submitted as an Exhibit 1 to defendant's motion to suppress (Dkt. # 20-1) states that agents arrived at approximately 8:10 p.m.

evidence could be in danger of destruction.  Turner testified that he believed that the running he heard upon approaching the house  was coming from inside the house.  Turner also stated that his experience over the years in similar circumstances led him to believe that this was the type of incident in which destruction of evidence might occur.  Turner also testified that he wanted to secure the house for officer safety.   Turner stated that the shotguns he observed by the front door and the two pounds of methamphetamine he believed had left the residence created a threat to both agents and the general public that he believed was greater than the threat a general request for consent at a residence would normally pose.  He also explained that the running noises inside the residence caused concern because he did not know if individuals inside were going to get other weapons.

Turner testified that agents continued to announce themselves as police and requested that any individuals inside the residence exit.  Turner testified that the third or fourth time agents announced themselves three individuals came out of the residence.  Turner testified that the three individuals were defendant, a female identified as Cherokee Wilson, and a juvenile male, identified as defendant's brother.  Turner testified that, before securing the residence, the agents placed the three individuals in handcuffs.  Turner testified that they placed the individuals in handcuffs for officer safety based upon the number of agents present, the part of town in which the residence was located, the fact that it was dark outside, and the guns Turner observed immediately inside the residence.  Turner testified that he had probable cause to arrest the individuals, but that agents only detained the individuals.  Turner stated that they had not come to the residence intending to arrest anyone; rather they were interested in recovering additional methamphetamine.  Turner stated that after handcuffing the individuals, he asked whether any other person was in the residence.  Turner testified that all three individuals said they did not know if others were present in the residence.

Turner testified that the agents then cleared the residence, which involved a systematic safety sweep to ensure that no other individual was inside. Turner stated that the last room to be cleared was the bedroom and that, as agents approached the bedroom, one agent opened the hallway door to a closet. Turner testified that, when the agent opened the door, Turner observed a silhouette and ammunition on the ground inside the closet. Turner testified that he announced himself by stating "Police, police, police." Turner stated that after several announcements, a juvenile male exited the closet. Turner testified that he placed the juvenile in handcuffs. Turner testified that the juvenile had a phone in his hand and carried a Hello Kitty backpack. Turner stated that agents searched the individual and the backpack, discovering three loaded handguns and methamphetamine in the backpack. Turner testified that he took the juvenile outside the residence while other agents finished clearing the residence.

Turner testified that, back outside, he spoke with defendant. Turner questioned defendant about gang affiliation based upon the clothing that defendant was wearing, particularly noting the presence of yellow and purple clothing. Turner testified that defendant stated he was a member of the Latin Kings. Turner testified that he also asked defendant about whether anything illegal was inside the residence and asked for consent to search the residence. Turner testified that defendant did not give consent to search the residence and that Turner thereafter applied for a state search warrant. Tuner testified that, to obtain the search warrant, he prepared an affidavit on his laptop in his vehicle in front of the residence and returned to OBN's Tulsa office to submit the affidavit to the on-call judge for Tulsa County. Turner stated that, after the judge signed the search warrant at approximately 9:58 p.m., he or another agent contacted the officers on site advising them that the search warrant had been issued. Turner testified that the agents on site then began to search the

residence. Turner testified that he believed that he had enough probable cause to secure a search warrant without entering the house, and would have done so had the circumstances allowed.

On cross-examination, Turner testified that he was not in the residence at the time the drug transaction allegedly occurred, that he was not in the white Ford pickup truck, and that, while he believed the methamphetamine recovered in the truck came from the residence, he did not have actual knowledge that this occurred. Turner also stated that he did not speak to anyone subsequent to the traffic stop who stated that the methamphetamine had been obtained from the residence. Turner stated that he used some of the information obtained from sweeping the residence to obtain the search warrant and acknowledged that no one gave him permission to enter the residence to conduct a search. Turner testified that it was not a common occurrence for drug dealers to leave their doors wide open with shoguns in plain view. Turner explained that he observed the front door more than halfway open, about 60 to 70 degrees, and that he could see that the door was open when approaching the residence in his vehicle. Turner testified that he did not touch the door to get a better view inside the residence, that he did not lean into the residence to view the shotguns inside the door, and that he did not break the plane of the threshold to view the shotguns.

Tuner also testified that when the three individuals came to the front of the residence, the defendant appeared first, followed by Cherokee Wilson, and finally followed by a juvenile male. When asked about an affidavit from DEA Agent Epps that stated that the juvenile male was the first individual to come to the front, Turner testified that he did not dispute that Epps' affidavit stated as much, but that Turner did not recall the events in that manner. Finally, regarding questioning about the clothing defendant wore that caused Turner to question defendant about gang affiliation, Turner testified that, when defendant came to the door, he was wearing colors that indicated to Turner that

defendant might be affiliated with a gang.  In response to a question about a TRACIS report that defendant introduced as an exhibit and that stated that defendant was dressed in a black sweatshirt and black slacks, Turner testified that agents provided defendant a sweatshirt because it was cold outside, and that defendant was not wearing the sweatshirt when Turner first observed defendant's clothing.  Turner also testified that defendant had some piece of purple or yellow on each part of his body, including bandanas.

### B. OBN Senior Agent Varney

The Court next heard testimony from OBN Senior Agent Matt Varney, who testified that he was called to assist with the investigation involving the 731 North Atlanta Avenue residence. Varney stated that the assignment he received was to assist in making contact with the residents at this address and attempt to obtain consent to search the residence.  Varney explained that his role was to serve as extra personnel to make sure that the encounter with the residents was safely conducted.  Varney testified that, upon turning onto Atlanta Avenue, he observed from his vehicle that the front door of the residence was ajar and that light was coming out of the doorway.  Upon arriving at the residence, Varney testified that agents exited their vehicles and approached the residence on foot.  Varney testified that, while approaching the front of the residence, he heard someone state that people were running inside the residence.  Varney stated that he did not recall hearing someone running, but that he recalled hearing the statement.

Varney testified that, once the agents arrived on the porch of the residence, he heard someone state that he could see guns, but he did not remember who made the statement.  Varney testified that agents then began announcing their presence and commanding people inside the residence to exit, after which people began filtering from the back of the residence to the front.  Varney testified that

he could not see the people coming out, but that he could hear the agents nearer the door engaging those who were coming to the door. Varney testified that three individuals exited the residence--one adult male, one female, and one juvenile male. Varney testified that he then assisted agents in a protective sweep of the residence to ensure that no other individuals were hiding inside the residence. He testified that the sweep revealed the presence of another juvenile male hiding in a closet off of the hallway. Varney testified that, after the sweep, he remained on the porch with the detained individuals waiting for a search warrant. After agents obtained a search warrant, Varney testified that he provided front security of the residence during the search.

On cross-examination, Varney testified that the front door of the residence was not all the way open, but that he could not recall the degree to which it was open. Varney also testified that he did not observe the two shotguns near the doorway until he exited the residence, explaining that he was not focused on this area of the residence when entering because other agents had already cleared this area. He explained that he was instead focused on other areas that might present a danger to agents.

### C. OBN Agent Gilmore

The Court next heard testimony from OBN Agent Spencer Gilmore, who testified that he was called to assist in the investigation at 731 North Atlanta Avenue, possibly including the execution of a search warrant. Gilmore testified that his assignment was to help conduct a search of the residence and clear the residence. Gilmore testified that upon driving up to the residence, he observed that the front door of the residence was open. He explained that he could observe the open front door because it was dark outside and the interior lights from the residence illuminated the opening. Gilmore testified that he met Turner and Varney on the font porch of the residence.

10

Gilmore stated that he heard individuals shuffling towards the back of the residence, a noise he characterized as "nervous shuffling."  Gilmore stated that agents announced their presence, after which three individuals came out of the rear of the residence to the front door.  Gilmore stated that the agents detained the three individuals on the front porch and then cleared the residence.  Gilmore testified that he recalled hearing TFO Turner announce "Police," but he did not recall any other announcements.

On cross-examination, Gilmore stated that he was the first or second person to enter the residence.  He stated that he did not recall if he entered the home ahead of TFO Turner, stating that the three agents on the porch entered the residence very closely together.  Gilmore also stated that the front door was obviously open when the agents approached, stating that he could see the open door from several yards away.  He testified that no agents touched the door when they arrived on the front porch.  Gilmore testified that he did not notice the shotguns as he entered the residence, stating that his focus was on the rear of the house where he believed other people might be hiding and where he believed the biggest risk of danger existed.  Gilmore testified that he saw the shotguns upon exiting the house after securing the residence.  He stated that it would be possible to see the shotguns from outside the residence, but explained that he did not observe them from his position on the porch.

### D. OBN Agent Tucker

The Court next heard testimony from OBN Agent Jason Tucker.  Jason Tucker is an OBN Agent out of the McAlester region, serving in the Poteau office.  He testified that he had a shift monitoring a wiretap on December 14, 2015, and that, after his wiretap shift ended, he received a call to help with an investigation in Tulsa.  Tucker stated that his assignment was to assist with a

knock-and-talk investigation at the residence at 731 North Atlanta Avenue.  Tucker testified that he was one of the last to arrive at the residence and he parked his vehicle down the street because there was no space closer to the residence available.  He testified that he did not remember seeing whether the front door was open.  He stated that, as he was walking up to join the other agents, he heard one of the agents yell that someone was running.  He stated that he then heard agents at the front door announcing themselves and calling for individuals in the house to come forward.  He stated that two or three individuals exited the house, at which point the agents entered the residence to conduct a protective sweep.  Tucker testified that he assisted in the clearing of the residence, which resulted in the discovery of an individual in a closet.  Tucker testified that, as he exited the residence, he observed a shotgun in a chair near the door.  He stated that this was the first time he observed any shotguns in the house.

On cross-examination, Tucker stated that he did not notice whether the front door to the residence was open because he was more focused on joining the other agents due to his late arrival. He stated that he did not remember paying any attention to the front door.  Tucker stated that he did not remember seeing two shotguns in the residence, and that he did not remember seeing two shotguns straddling two pieces of furniture.  He stated that he only recalled seeing one shotgun in a chair.

### E. OBN Narcotics Agent Morrison

The Court next heard testimony from OBN Narcotics Agent John Morrison, who testified that he served as the case agent for the OBN on the wiretap involving Cody McClendon's cell phone.  Morrison testified about the communications that agents intercepted from McClendon's cell phone among McClendon and two co-conspirators, Green and Trammel, regarding the trip to Tulsa,

to pick up approximately two pounds of methamphetamine.  Morrison testified that, based on this information, he contacted law enforcement in Tulsa and began surveillance.  Morrison testified that, through the intercepts, agents identified a white vehicle with a tan top that was involved in the transaction.  He stated that the vehicle that was supposed to pick up the methamphetamine was a white Ford F-150 pickup truck.  He also stated that the wire intercepts provided agents information that the transaction was to occur at 731 North Atlanta Avenue in Tulsa.

Morrison stated that agents established surveillance to monitor whether the two vehicles met up.  He stated that intercepted communications suggested the vehicles would meet up at a grocery store, but his surveillance observed the white Ford F-150 pickup truck go directly to the address on Atlanta Avenue.  Morrison later clarified that it was possible that other agents could have seen the vehicles meet up, but he personally did not observe it.  Morrison stated that, based on information from the wire intercept, the truck did not stay at the Atlanta Avenue address long.  He testified that, after learning about the traffic stop and recovery of two pounds of methamphetamine,  he and TFO Turner drove by the residence and observed a white vehicle with a tan top parked in the driveway, with the front of the vehicle facing the street.  He testified that he and TFO Turner then met up the other law enforcement agents before returning to the residence to see if they could make contact.

Morrison stated that, upon arriving at the residence, he observed that the white vehicle with the tan top was no longer parked in the driveway.  He also stated that, from the vehicle, he observed that the front door to the residence was open.  He stated that he could see the open door because it was dark outside and lights inside the house illuminated the doorway.  Morrison testified that agents exited their vehicles and approached the front door.  He stated that, as they approached the front door, he heard someone in front of him yell that someone was running inside the residence toward

the back of the house.  Morrison testified that, in response to this, he ran toward the back of the residence to see if he could catch anyone running out the back of the house.  He stated that, while standing at the back of the residence, he heard yelling at the front of the house, including an announcement identifying police and someone yelling that he could see a gun inside the residence. He stated that he heard movement inside the residence and that at some point he heard police encounter an individual at the back of the residence and heard police identify themselves and call for the person to come out.  Morrison then testified that he was called to the front of the residence to help secure the individuals who had been in the house.  He stated that at some point he entered the house and saw shotguns, but did not remember where he had seen them.

On cross-examination, Morrison stated that he heard someone shout that they could see a gun.  He also stated that he did not see any guns until he entered the front door, admitting that he did not know where the guns were in relation to the front door when officers made their initial entry into the residence.

### F. DEA Agent Epps

Agent Brian Epps provided testimony regarding the events leading up to and including the search of the residence at 731 North Atlanta Avenue, and testified as to the following time line for December 14, 2015:

- 4:00 p.m. - Officers intercept a phone call between Cody McClendon and an unidentified Hispanic male, during which McClendon and the unidentified Hispanic male negotiate the purchase of what agents believe to be two pounds of methamphetamine in exchange for $8,000.  McClendon states that his partners would travel to Tulsa for the pickup.  Agents then intercept communications between McClendon and Donald Trammel in which McClendon instruct Trammel to pick up the methamphetamine. Trammel responds that he prefers that another individual carry the methamphetamine, but that he will guide the other individual.

- 5:20 p.m. (approximate) - Officers intercept a text message from Trammel to McClendon stating that they are getting ready to go. Trammel and McClendon communicate about Trammel traveling to Tulsa with Nathan Green. Trammel states that Green will be driving a White Ford pickup. Agents set up surveillance to observe Trammel and Green coming from Tahlequah into Tulsa. Surveillance picks up Trammel and Green on the Broken Arrow Expressway traveling in tandem. Agents intercept communication between McClendon and the unidentified Hispanic male: a message stating "Hey, they're on their way"; a message from the Hispanic male to McClendon stating "Have him go to Mercado Las Americas at the intersection of Admiral and Lewis and our guy will be there"; and a message from the Hispanic male to McClendon stating "Tell him to look for a White Grand Marquis with a brown top."

- 7:00 p.m. (approximate) - Agents arrive at area around Mercado Las Americas, including Agent Epps. Agents intercept phone calls between McClendon and Green or Trammel stating that Green has gotten lost driving in Tulsa. Agents intercept a text message from the unidentified Hispanic male to McClendon providing the 731 North Atlanta Avenue address.

- 7:20 p.m. (approximate) - Nathan Green arrives at Mercado Las Americas in a white Ford pickup truck. The white car with brown top pulls up next to Ford pickup in the parking lot and, after less than a minute, the vehicles leave in tandem.

- 7:25 p.m. (approximate) - The white Ford pickup truck and white car with brown top arrive at 731 North Atlanta Avenue.

- 7:29 p.m. - Agents intercept message from unidentified Hispanic male to McClendon stating "Your guy is in the house, they're counting the money."

- 7:38 p.m. - Agents intercept a call from Green to McClendon in which Green states that he is leaving the residence and asking where to meet up with Trammel.

- 7:45 p.m. (approximate) - Traffic stop of Green's vehicle occurs. Agents intercept phone calls during the traffic stop among Green, Trammel, and McClendon. Green states that he has been stopped and Trammel states "They've got the drug dog, it's over, they've got it." Trammel notifies McClendon when Green is put in patrol car and states "Hey, it's over. They've got him." McClendon calls the Hispanic male and tries to arrange another purchase of one pound of methamphetamine.

- 9:45 p.m. (approximate) - Agent Epps arrives at residence and helps conduct search pursuant to search warrant.

On cross examination, Epps stated that agents believed the unidentified Hispanic male to be another inmate in a prison somewhere, but stated that agents were unable to positively identify him.

### G. Cherokee Wilson

The Court heard testimony from Cherokee Wilson, defendant's girlfriend, who rented the home at 731 North Atlanta Avenue. Cherokee Wilson testified that she was in the home the night of December 14, 2015.  She stated that, when police arrived, she was in the residence with defendant, defendant's younger brother, and another juvenile male.  Wilson testified that she had been renting the home for approximately one week.  She stated that the home did not come furnished and she rented furniture from Rent-A-Center.  She testified that Rent-A-Center delivered the furniture between 7:00 p.m. and 7:30 p.m. on December 14, 2015.  She testified that she rented a living room set and a bedroom set, which included a bed, dresser, and a small end dresser.  She stated that the delivery men left all of the furniture in the living room, including the unassembled bed. Wilson testified that the Rent-A-Center delivery men entered and exited the residence through the front door.  She stated that after the delivery men left, she shut the front door behind her, heard the door latch, and felt it shut.  Wilson testified that she arranged the living room furniture, and that defendant came to her house to move and assemble her bedroom furniture. She testified that defendant entered the residence through the back door.  She stated that no one utilized the front door of the residence after the delivery men from Rent-A-Center delivered the furniture.  Wilson testified that she was cooking dinner in the kitchen and could see the front door from her position.  She stated that the front door was closed and that the wind did not blow it open at any point.  Wilson testified that, while she was cooking, defendant and his brother were assembling the bedroom furniture.

16

Wilson testified that the shotguns officers observed immediately inside the residence were hers, but that the photograph the government offered as an exhibit depicting their location on a table did not accurately reflect where she last left the shotguns. Wilson testified that she left the shotguns leaning against a chair, and they would not have been visible from an open front door.

On cross-examination, Wilson identified defendant as her boyfriend. Wilson stated that he had never spent the night at her home because she had just moved in. When asked about the rental agreement from Rent-A-Center that included only living room furniture, Wilson testified that she rented the bedroom furniture at the same time and that it should have been on the rental agreement. She explained that the furniture arrived in pieces, but did not know whether defendant and his brother had finished assembling the furniture when the police arrived. Wilson stated that the Rent-A-Center deliverymen left between 7:30 p.m. to 7:45 p.m. and explained that when the delivery men came, her shotguns were in the bedroom. She stated that sometime between when the delivery men left and the police arrived, at approximately 8:10 p.m., she moved the shotguns from the bedroom to the living room. When questioned about whether she might be mistaken about the date of delivery, Wilson reiterated her statement that the furniture delivery occurred on December 14, 2015, but stated that she could have the times wrong. She also stated that she paid for two days of furniture rental before delivery, because she rented the furniture on December 12, 2015.

On re-direct examination, Wilson testified that, although she rented the furniture on December 12, 2015, it was not delivered until December 14, 2015, because December 12th was a Saturday and she rented too late in the day for delivery. She also stated that Rent-A-Center did not deliver on Sundays.

### H. Rebuttal

After this testimony, the government recalled Agent Epps as a rebuttal witness.  Epps stated that

surveillance did not observe a delivery truck of any kind at the residence at any point in the evening

and that, when he entered the residence after the search warrant had been issued, he did not see any

unassembled beds in any bedrooms in the house.  Defendant then recalled Wilson, who testified that

Rent-A-Center made two visits to her home that day, with the second visit necessitated by Rent-A-

Center's failure to bring the rails for the bed with the first delivery.

### III. Factual and Credibility Findings

The Court finds that the front door to residence at 731 North Atlanta Avenue was open on

the night of December 14, 2015 when police agents arrived.  The testimony of Turner, Varney,

Gilmore, Tucker, and Morrison is consistent and the Court finds that their testimony was credible.

Turner, Varney, Gilmore, and Morrison all testified that they observed the door to 731 Atlanta

Avenue open upon arriving at the scene.  Agent Tucker was the only law enforcement officer who

testified that he did not observe the front door of the residence open, but Agent Tucker provided a

credible explanation that did not conflict with the other agents' recollections of an open door.  Agent

Tucker testified that he was late to arrive to the residence, and his focus was on catching up to the

group of agents approaching the door, not on making any observations about the residence.  The

Court does not find Wilson's testimony credible on this point, particularly in light of her conflicting

testimony, discussed in more detail below.

The Court notes that the overall testimony of the agents was credible.  The agents' testimony

was consistent, with any minor discrepancies explained by each agent's individual position or

assignment during the investigation.  The Court also notes that the officers did not offer a rehearsed

version of events in their testimony, instead recounting individual observations that, when viewed together, provide a comprehensive and consistent version of events.

The Court finds that the TFO Turner heard running inside the residence and shouted "Runner" to alert other agents. Turner and Gilmore both testified that they heard the sounds of a person or person running inside the residence, and Turner testified that he shouted "Runner" to alert other agents. Varney, Tucker, and Morrison all testified that they heard someone shout "Runner" while approaching the residence. Only Agent Gilmore testified to the contrary, but stated only that he did not remember hearing such an announcement, not that he was certain such an announcement had not occurred. The Court does not find that this minor discrepancy undermines the credibility assessment of the other agents.

The Court finds that two shotguns immediately inside the residence were visible from the open front door. The Court credits Turner's testimony that he viewed the shotguns clearly from the open front door without touching the front door, entering the residence, or breaking the plane of the threshold. The Court also finds that Turner announced that he observed a gun. The Court credits the testimony of Varney and Morrison who both testified that they heard someone shout that he had seen a gun. The other agents on the scene who did not testify to hearing such an announcement, Gilmore and Tucker, testified only that they did not recall an announcement of that kind. They did not testify that they were certain they did not hear such an announcement made. The Court does not find that this minor discrepancy undermines the credibility assessment of the other agents.

The Court finds that the testimony of Wilson was not credible. Wilson's statements regarding the time line of the evening were not believable. Based on Wilson's version of events, the following occurred between the time Rent-A-Center delivery men left the residence at roughly

7:45 p.m. and when agents arrived at the residence at approximately 8:10 p.m.: Wilson arranged the living room furniture; defendant moved the bedroom furniture to the bedroom; defendant built Wilson's bed; Wilson moved her shotguns from her bedroom to the living room; and Wilson prepared dinner.[3]  The Court does not credit Wilson's statements that these events all occurred in the same time frame, a conclusion that is further supported by Agent Epps' testimony regarding the time line of the evening based upon surveillance and contemporaneous telephone communications agents monitored through the wiretap.  Epps testified that at approximately 7:25 p.m. the white Ford pickup arrived at the residence, at 7:38 p.m. the pickup truck left the residence, and that agents conducting surveillance of the residence did not observe a delivery vehicle of any kind arrive at the residence on the night in question.  This evidence is directly contrary to Wilson's testimony that delivery men were at her residence at the same time.  And Wilson's later statement regarding a second delivery from Rent-A-Center was not credible because it was self-serving and made only after Agent Epps offered rebuttal testimony challenging Wilson's time line.  Wilson also had no explanation for why a rental agreement from Rent-A-Center did not include bedroom furniture or

---

[3]    The Court also notes that the DEA investigation report, attached to defendant's motion to suppress as Exhibit 1 (Dkt. # 20-1), and a color photograph of the living room submitted by defendant at the hearing as Defendant's Exhibit 3, further calls into question Wilson's credibility.  The DEA report describes evidence discovered in the bedroom and its location, including two notebooks, a set of brass knuckles, a digital pocket scale, a clear plastic bag with a small amount of crystalline substance, and a glass jar containing marijuana, all located on the dresser in the bedroom.  The report also describes nearly two hundred rounds of ammunition located in and around the master bedroom and closet.  The color photograph of the living room shows a decorated living room, including photographs and a lighted Christmas tree situated in between the furniture, and depicts a piece of furniture with a blanket draped across it and what appears to be a box of latex gloves resting on the blanket. These exhibits tend to show that the furniture had been in the residence longer than roughly thirty minutes before police arrived, contrary to Wilson's testimony.

why she did not have a separate receipt for the bedroom furniture.  Based on this evidence and observation of the witnesses, the Court finds that Wilson's testimony was not credible.

### IV. Analysis

The Fourth Amendment guarantees citizens the right "to be secure in their houses . . . against unreasonable searches." U.S. Const. amend. IV.  "The Fourth Amendment protects the individual's privacy in a variety of settings.  In none is the zone or privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individuals' home—a zone that finds its roots in clear and specific constitutional terms[.]"  Payton v. New York, 445 U.S. 573, 589 (1980). The Fourth Amendment provides that the "right of the people to be secure in their . . . houses . . . shall not be violated," language that "unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  Id. at 589-90 (alterations in original) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)).

Although warrantless entry into a home is presumptively unreasonable, officers may enter a home without a warrant if they have probable cause and there are exigent circumstances.  See Payton, 445 U.S. at 590; Kirk v. Louisiana, 536 U.S. 636, 639 (2002).  Exigent circumstances that may justify warrantless entry into a home include hot pursuit of a feeling felon, imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other people inside or outside a home.  Minnesota v. Olson, 495 U.S. 91, 100 (1990); United States v. Thomas, 372 F.3d 1173, 1177 (10th Cir. 2004).  However, the exigent circumstances exception to the warrant requirement is narrow and must be jealously and carefully drawn.  Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1240 (10th Cir. 2003).  There is no absolute

test for the presence of exigent circumstances because such a determination ultimately depends upon the unique facts of each controversy. United States v. Rhiger, 315 F.3d 1283, 1288 (10th Cir. 2003); United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993). The government bears a "heavy burden" to show exigency. United States v. Flowers, 336 F.3d 1222, 1230 (10th Cir. 2003); United States v. Scroger, 98 F.3d 1256, 1259 (10th Cir. 1996). In assessing whether the government has met the burden of proving exigency justifying a warrantless search, the Court evaluates the circumstances as they would have appeared to prudent, cautious, and trained officers. United States v. Anderson, 154 F.3d 1225, 1233 (10th Cir. 1998).

A. Destruction of Evidence

The government argues that imminent destruction of evidence constitutes an exigency that allowed the officers to lawfully enter the residence without a warrant. Dkt. # 22, at 6-8. Defendant responds that no exigency existed, rendering the warrantless search impermissible. Dkt. # 20, at 5. The Tenth Circuit has enunciated the requirements for a permissible warrantless entry based upon the imminent destruction of evidence:

> Warrantless entries justified on this basis must be "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse."

United States v. Hendrix, 664 F.3d 1334, 1338 (10th Cir. 2011) (quoting United States v. Aquino, 836 F.2d 1268, 1272 (10th Cir. 1988)).

Here, all four elements have been satisfied. First, clear evidence of probable cause existed regarding the trug trafficking investigation in which the agents were involved. "Probable cause to search requires 'a fair probability that contraband or evidence of a crime will be found in a particular

place.'" Id. (quoting United States v. Cooper, 654 F.3d 1104, 1124 (10th Cir. 2011)).  Here, the Court concludes that a fair probability existed that contraband or evidence of a crime would be found in the residence, based upon evidence including: the information agents obtained through the wiretap indicating that a drug transaction would take place at 731 North Atlanta Avenue; surveillance establishing that Green's pickup truck stopped at the residence; intercepted text messages that the drug transaction took place in the residence; the subsequent traffic stop of Green's pickup truck which revealed the presence of two pounds of methamphetamine; and the shotguns plainly visible through the open front door of the residence.

Second, the agents were investigating a drug trafficking crime, which, by its nature, is a serious crime.  See United States v. Carr, 939 F.2d 1442, 1448 (10th Cir. 1991) ("Drug trafficking crimes are serious . . . .").  And the circumstances indicated that destruction of evidence was likely. This included the agents' observation of the sounds of individuals running inside the residence, TFO Turner's shout of "Runner," the delay between the agents' first announcement and the three individuals' arrival at the front door, the two pounds of methamphetamine seized from the traffic stop that agents believed came from the residence,  and the testimony of TFO Turner that, based on his experience, this was a circumstance in which the destruction of evidence was likely.

Third, the sweep was limited in scope because agents conducted a sweep of the home in a manner limited to searching for any other individual who might be inside the residence.  The testimony of the agents demonstrates that they did no more than secure the residence when they entered and did not conduct a sweep that was greater in scope than was reasonably necessary to accomplish this aim.  Testimony established that the agents cleared each room of the house to ensure no other individuals were present and exited the home once they completed this task.

Finally, the facts demonstrate an exigency existed that was not subject to police manipulation or abuse. Although agents had not begun to procure a search warrant at the time they approached the residence, their actions demonstrate reasonable responses in the face of a rapidly evolving situation rather than a police-created exigency. The agents took no action that either violated or threatened to violate defendant's Fourth Amendment rights. See Kentucky v. King, 563 U.S. 452, 462 (2011) ("Where . . . the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."). The agents approached the residence with the intention of engaging the residents in a conversation and seeking consent to search the residence, and "[w]hen law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do." Id. at 469. The agents were within legal bounds when they approached the residence, and it was the behavior of the individuals inside the residence, not the officers, that created the exigency. See id. ("Occupants who choose not to stand on their constitutional rights but instead elect to attempt to destroy evidence have only themselves to blame for the warrantless exigent-circumstances that may ensue." )

The Court concludes that the agents entered the residence to prevent the destruction of evidence. As such, the agents' warrantless entry was permissible under the Fourth Amendment.

### B. Officer Safety

The government also asserts that the agents' warrantless entry was permissible under the Fourth Amendment because agents conducted a sweep to ensure the safety of the police based upon observation of two firearms visible from the front door and concerns about the presence of additional

24

weapons or persons.[4]  Dkt. # 22, at 6.  Defendant responds that no exigency existed allowing a warantless entry and sweep of the residence.  Dkt. # 20, at 5.

In United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007), the Tenth Court rejected a similar argument that a warrantless sweep of a residence for officer safety was permissible as an exigent circumstance.  In Walker, officers conducted a sweep of defendant's residence for officer safety after they had placed defendant in handcuffs and detained him on the front porch, but before they had placed him under arrest.  Id. at 1252.

---

[4]    An additional exception to the warrant requirement is a protective sweep incident to arrest. In Maryland v. Buie, 494 U.S. 325 (1990), the Supreme Court stated that:

> as an incident to the arrest, the officers could, as a precautionary matter and without probable cause  or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.  Beyond that, however, we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

Id. at 334.  The Tenth Circuit has been clear that a protective sweep "may take place only incident to arrest."  Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010); United States v. Walker, 474 F.3d 1249, 1254 (10th Cir. 2007);  United States v. Torres-Castro, 470 F.3d 992, 996 (10th Cir. 2006). TFO Turner testified that he had probable cause to arrest defendant, but stated that defendant was not under arrest when he was placed in handcuffs on the front porch.  Upon questioning from the Court, Turner reiterated his testimony that defendant was not under arrest, even though Turner testified that defendant remained handcuffed on the front porch for nearly two hours and was not free to leave.  An investigative detention may be "transformed" into an arrest under the Fourth Amendment under certain circumstances. United States v. Hamilton, 587 F.3d 1199, 1215 (10th Cir. 2009).  These circumstances may include the use of handcuffs, firearms, other police techniques inconsistent with the limited scope of an investigation, or a detention so lengthy that the investigative detention escalates into a de facto arrest.  United States v. White, 584 F.3d 935, 952-53 (10th Cir. 2009).  The Court does not decide whether a de facto arrest occurred during this lengthy detention, but notes that, if defendant were under arrest, the protective sweep would have been permissible incident to arrest.

The Court first noted that Tenth Circuit precedent clearly required an arrest to justify a protective sweep pursuant to Maryland v. Buie, 494 U.S. 325 (1990), and concluded that, because defendant was not under arrest, this protective sweep doctrine was inapplicable.  Id. at 1254.  The Court then considered the permissibility of the sweep under the exigent-circumstances doctrine:

> The sweep may nevertheless have been proper under the exigent-circumstances doctrine set out in [United States v.] Najar, 451 F.3d [710,] 717 [10th Cir. 2006)]. In the context of this case, however, application of the exigent-circumstances doctrine to justify a sweep for the purpose of officer safety would eviscerate our precedent establishing an incident-to-arrest requirement for such a protective sweep. We note that both Najar and the Supreme Court opinion on which it relied Brigham City v. Stewart], 547 U.S. 398 (2006), involved Fourth Amendment intrusions justified by a threat to a civilian's safety.  Therefore, absent clarification from an en banc court, we refrain from justifying this sweep by applying the exigent-circumstances exception based on officer safety.

Id.  In a subsequent opinion citing Walker, the Tenth Circuit further clarified:

> Under Maryland v. Buie,494 U.S. 325 (1990),  a "protective sweep" of a residence to ensure officer safety may take place only incident to an arrest.  Id. at 334;  United States v. Walker 474 F.3d 1249, 1254 (10th Cir. 2007).  As we discuss below, the officers did not arrest [defendant], so the search could not have been incident to an arrest.   "The sweep may have nevertheless been proper under the exigent-circumstances doctrine" *if* reasonable grounds existed to search to protect the safety of someone besides the officers.  Walker, 474 F.3d at 1254.  In other words, if they had a "threat to civilian safety."  Id.

Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1072 (10th Cir. 2010).  Thus, under Tenth Circuit precedent, a protective sweep based on exigent circumstances may be justified only when a threat to civilian safety is involved, not simply a threat to officer safety.

In Kentucky v. King, a 2011 Supreme Court decision post-dating both Walker and Armijo, the Supreme Court discussed warantless searches based on exigent circumstances.  563 U.S. at 461. The Court first noted that "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness'" Id. at 459 (quoting Brigham City, 547 U.S. at 403)).   The Court then focused on exigent

circumstances regarding destruction of evidence, before enunciating a general test to determine whether a search is permissible based on exigent circumstances. Id.  The Court explained that "the exigent circumstances rule applies when police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment," and concluded that "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement.  Therefore, . . . the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense."  Id. at 461, 470.

Here, considering the totality of the circumstances, the agents acted reasonably at every step in the investigation, doing no more than what was necessary to protect themselves.  Agents arrived at the front door, and, after observing firearms from the open doorway, called for occupants of the residence to come out.  They did not immediately enter the residence upon observation of the shotguns.  Agents detained, rather than arrested, the three individuals on the front porch to ensure agents safety, even though TFO Turner testified that he had probable cause to arrest defendant at this point.  And the agents who entered the residence to conduct the protective sweep conducted the sweep with the limited purpose of discovering any other individual inside the residence.  And, upon discovery of another individual in the residence, agents searched only the individual and the backpack he was carrying to ensure their safety.  Agents did not conduct a more thorough search until after they obtained a search warrant.  The Court concludes that these facts demonstrate that agents acted reasonably throughout the entire encounter.

The Court notes that Tenth Circuit precedent allows a protective sweep for officer safety incident to arrest only. Because the Court concludes that the agents' sweep of the residence was

permissible to prevent the destruction of evidence, the Court does not decide whether the agents' search was permissible under the doctrine of exigent circumstances for officer safety, either incident to a de facto arrest, see supra n.3, or pursuant to the reasonableness standard in King. This Court questions the continuing viability of the absolute rule of Walker and Armijo (as opposed to a reasonableness rule) in light of the reasonableness standard the Supreme Court enunciated in King. This Court cannot conclude, based on the touchstone standard of reasonableness, that a protective sweep to preserve of a bag of methamphetamine or marijuana is of more importance than a protective sweep to ensure the safety of those officers who respond to a dangerous situation. However, the resolution of the continued viability of Tenth Circuit precedent is a matter for that court.

### C. Inevitable Discovery

The government finally argues that defendant's motion should be denied even if the Court were to find a constitutional violation because the evidence would have eventually been discovered lawfully and is thus admissible under the doctrine of inevitable discovery. Dkt. # 22, at 8-10. "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation would have discovered it." United States v. Martinez, 512 F.3d 1268, 1273-74 (10th Cir. 2008). To avail itself of the inevitable discovery rule, the government must show by a preponderance of the evidence that the evidence would have been discovered without a Fourth Amendment violation. Id. The Tenth Circuit considers the following factors in determining whether the inevitable discovery doctrine applies to a given situation:

"1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of showing probable cause at

the time the search occurred; 3) whether a warrant was ultimately obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Cunningham, 413 F.3d 1199, 1203-04 (10th Cir. 2005) (quoting United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)).

The first factor counsels against the application of the doctrine of inevitable discovery. At the time agents conducted the sweep of the residence, the agents had not procured or initiated the process for procuring a search warrant. But the second, third, and fourth factors weigh in favor of applying the doctrine of inevitable discovery. See United States v. Christy, 739 F.3d 534, 543 (10th Cir. 2004) ("While we have referred to preliminary steps to obtain a warrant a 'prerequisite' and a 'requirement,' these descriptions are likely dicta. A close reading of Souza[, 223 F.3d at 1205] and its underpinnings indicates that an effort to obtain a warrant is but one factor of the inevitable discovery doctrine in this circuit." (internal citations omitted)).

Regarding the second factor, there was a strong showing of probable cause at the time the search occurred. Agents had probable cause to believe that a drug trafficking or maintaining a drug premises offense had occurred, as is evidenced by the wiretap communications about a transaction involving two pounds of methamphetamine, the specific address of the residence, the specific information regarding the vehicles that would be involved in the transaction and which surveillance observed at the residence, the text messages that the transaction had occurred at the residence, the traffic stop of one of the vehicles after it left the residence and the subsequent discovery of two pounds of methamphetamine, and the two shotguns visible through the open front door of the residence. In combination, this evidence provided agents with sufficient probable cause to believe that a drug trafficking or maintaining a drug premise offense had occurred. With respect to the third

factor, agents initiated the process of obtaining a search warrant immediately after securing the house.  Although agents did not obtain a warrant until roughly two hours after arrival at the house, the agents did not delay in seeking a warrant after they secured the residence and detained the individuals inside.  Agents ultimately obtained a warrant and conducted a thorough search of the residence pursuant to that warrant.  Finally, there is no evidence that agents "jumped the gun" because they lacked evidence in their showing of probable cause.[5]  Agents believed they had probable cause to arrest defendant before they entered the residence, as is evidenced by TFO Turner's testimony to that effect.  And, as discussed above, agents had significant evidence prior to their entry into the residence that provided them probable cause.  There is no evidence that the agents' entry into the home was for any purpose other than securing the residence from destruction of evidence or any danger that another individual inside the residence might pose.  This conclusion is supported by the limited scope of the agents' sweep and the fact that agents waited for a search warrant to search the entire residence.

The Court concludes that, although agents had not applied for a search warrant at the time they entered the home, the other factors weigh heavily in their favor.  As such, the Court concludes that the doctrine of inevitable discovery applies because agents would have eventually discovered the evidence in a lawful manner, even if a violation of defendant's Fourth Amendment rights had occurred.

---

[5]     In that regard, TFO Turner supplied compelling testimony that, had the events not unfolded as they did, agents would have obtained a warrant before entering the residence.  But, because agents heard running and observed firearms inside there residence, their response to an evolving situation required a warrantless entry based on exigent circumstances before they could obtain a warrant.

## V.

The Court concludes that the agents permissibly entered the residence without a warrant due to exigent circumstances based on the threat of imminent destruction of evidence.  As such, they did not violate defendant's Fourth Amendment rights by entering the residence to conduct a sweep without a warrant.  Further, because the warantless entry was lawful, the evidence obtained when the agents executed the search warrant is not tainted by a constitutional violation.  In the alternative, the Court finds that the evidence would be admissible under the doctrine of inevitable discovery, even if a Fourth Amendment violation occurred.  Defendant's motion to suppress should thus be denied.

**IT IS THEREFORE ORDERED** that defendant's Motion to Suppress and Brief in Support (Dkt. # 20) is **denied**.

**DATED** this 14th day of April, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE